# EXHIBIT A

[Complaint]

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Philadelphia Newspapers, LLC, *et al.*, | ) Case No. 09-11204(SR) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| Philadelphia Newspapers, LLC, *et al.* | ) |
| 400 North Broad Street | ) |
| Philadelphia, PA 19103, | ) Adversary No. 10-_____(SR) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Citizens Bank of Pennsylvania | ) |
| 1701 John F. Kennedy Boulevard | ) |
| 22nd Floor | ) |
| Philadelphia, PA 19103, | ) |
| | ) |
| Wells Fargo Foothill, Inc. | ) |
| 2450 Colorado Avenue, Suite 3000W | ) |
| Santa Monica, CA 90404, | ) |
| | ) |
| Credit Suisse Loan Funding LLC | ) |
| 11 Madison Avenue | ) |
| New York, NY 10010, | ) |
| | ) |
| Defendants. | ) |

## DEBTORS' COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to Federal Rules of Bankruptcy Procedure 7001(7) and 7065 and 11 U.S.C. §§

105(a) and 364, the above-captioned debtors and debtors in possession PMH Acquisition, LLC,

Broad Street Video, LLC, Philadelphia Newspapers, LLC, Philadelphia Direct, LLC, Philly

Online, LLC, PMH Holdings, LLC, Broad Street Publishing, LLC, Philadelphia Media, LLC and

Philadelphia Media Holdings, LLC (collectively, the "Debtors") bring this Complaint for declaratory and injunctive relief. In support of this Complaint, the Debtors aver as follows:

1.    This is an adversary proceeding commenced by the Debtors, pursuant to sections 105(a) and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rule 7001(7) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable hereto by Bankruptcy Rule 7065.

## THE DEBTORS AND DEBTORS IN POSSESSION

2.    The Debtors own and operate numerous print and online publications in the Philadelphia market, including *The Philadelphia Inquirer* (the "Inquirer"), the *Philadelphia Daily News* (the "Daily News"), several community newspapers, the region's number one local website, philly.com ("Philly.com"), and a number of related online products. The Debtors' flagship publications are the Inquirer, the third oldest newspaper in the country and the winner of numerous Pulitzer Prizes and other journalistic recognitions, and the Daily News.

3.    Both the Inquirer and Daily News are owned and operated by Debtor Philadelphia Newspapers, LLC. The Debtors also distribute award-winning news, sports and commentary from the Inquirer and Daily News through Philly.com, which is operated by Debtor Philly Online, LLC. Debtor Broad Street Publishing, LLC also publishes a series of community newspapers and advertising publications in the Philadelphia area, including the Northeast Times, Star, and My Community Trend.

4.    Debtor PMH Acquisition, LLC, a Delaware limited liability company ("Holdings"), was formed for the purpose of acquiring the seven subsidiary Debtors. Holdings is

the sole owner of one hundred percent of the equity interests in each of the seven subsidiary

Debtors, which in turn own and operate the Daily News and the Inquirer.

5.    Debtor Philadelphia Media Holdings, LLC ("PMH") is the holding company that

indirectly owns 100% of the equity of Debtor Philadelphia Newspapers, LLC.  PMH has no

operating business or employees, and has no material assets.

## THE DEFENDANTS

6.    Defendant Citizens Bank of Pennsylvania ("Citizens") is a Pennsylvania bank with

a business address of 1701 John F. Kennedy Boulevard, 22nd Floor, Philadelphia, PA 19103.

7.    Defendant Wells Fargo Foothill, Inc. ("Wells Fargo Foothill") is, upon information

and belief, a California corporation with a business address of 2450 Colorado Avenue, Suite

3000W, Santa Monica, CA 90404.

8.    Defendant Credit Suisse Loan Funding LLC ("Credit Suisse") is, upon information

and belief, a New York limited liability company with business address of 11 Madison Avenue,

New York, NY 10010.

9.    The Debtors are parties to a Credit and Guaranty Agreement dated June 29, 2006

with Citizens, as administrative and collateral agent, and certain other lender parties

(collectively, the "Senior Secured Lenders").[1]   Upon information and belief, Citizens and Credit

Suisse are current Senior Secured Lenders and Wells Fargo was a Senior Secured Lender until

approximately December 2009.

10.    The Debtors are also parties to a Debtor-in-Possession Credit and Guaranty

Agreement dated as of September 30, 2009 with Citizens, as the administrative, collateral and

---

[1] Throughout these cases, the Senior Secured Lenders have ostensibly been represented by Citizens and a self-appointed group called the Steering Group of Prepetition Lenders ("Steering Group").   References to the positions taken by the Senior Secured Lenders refer to the collective positions advanced by Citizens and the Steering Group.

co-syndication agent and lead arranger, and Wells Fargo Foothill, as co-syndication agent ("DIP Agreement").    In addition to Citizens and Wells Fargo, Credit Suisse is a lender under the DIP Agreement.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b) and (e) as this matter arises in, under and is related to a pending bankruptcy case.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B), (D), (M) and (O).

12.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    This adversary proceeding is initiated under Bankruptcy Rule 7001(7) and the relief requested herein may be ordered pursuant to Bankruptcy Rule 7065 and section 105(a) of the Bankruptcy Code.

## BACKGROUND

14.    On February 22, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code with the exception of Philadelphia Media Holdings, LLC, which filed its voluntary petition on June 10, 2009.

15.    The factual background relating to the Debtors' commencement of these Chapter 11 cases is set forth in detail in the *Declaration of Richard R. Thayer, the Executive Vice President, Finance of the Debtors In Support of First Day Motions* filed on February 22, 2009 and incorporated herein by reference.

## THE STIPULATION AND DIP AGREEMENT

16.    On February 23, 2009, the Debtors filed a Motion for Entry of an Order: (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Superpriority

Claims, (C) Authorizing Use of Cash Collateral, and (D) Granting Adequate Protection to Prepetition Senior Lenders. On February 24, 2009, the Senior Secured Lenders opposed this Motion, *inter alia*, because the postpetition financing was to be provided by an insider.

17.    The Senior Secured Lenders proposed that they provide postpetition financing to the Debtors but only on the condition that the Debtors essentially turn over the reorganization process to them, a proposal that was rejected by the Debtors.

18.    On August 4, 2009, the Debtors filed an Amended Motion for Entry of an Order: (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Superpriority Claims, (C) Authorizing Use of Cash Collateral, and (D) Granting Adequate Protection to Prepetition Senior Lenders ("Amended Motion") seeking approval of a debtor-in-possession ("DIP") financing facility from a third party bank in order to alleviate any concerns the Senior Secured Lenders had regarding the facility being providing by an insider.

19.    Notwithstanding the Debtors' attempts to resolve the Senior Secured Lenders' concerns, on August 19, 2009, the Senior Secured Lenders opposed the Amended Motion.

20.    In the spirit of conciliation, on August 28, 2009, the Debtors entered into a Stipulation and Order (the "Stipulation") resolving various issues, including DIP financing, by confirming the agreement of the parties that Citizens, as agent for the Senior Secured Lenders, and certain other members of the Steering Group would provide postpetition DIP financing to the Debtors.

21.    In addition to addressing DIP financing, the Stipulation set forth a schedule related to the chapter 11 plan and sale process, including the auction and the confirmation hearing, and provides that "[n]either the Debtors nor any other party-in-interest in the

**Bankruptcy Case shall seek further extension of the foregoing dates**." [Stipulation at ¶ 2

(emphasis added)].

22.    In the Stipulation, all parties also agreed that **"[t]ime is of the essence with

regard to each date and milestone set forth**" therein, and that the existence of such a timeline

"was a **material inducement** to the Parties entering into this Stipulation." [Stipulation at ¶ 2

(emphasis added)].

23.    At the time the Stipulation was agreed to, all parties understood that the Debtors

would seek approval of procedures for the sale of certain of the Debtors' assets that expressly

provided that the Senior Secured Lenders would not be permitted to credit bid at the auction.

Accordingly, on August 28, 2009, the Debtors filed a Motion to Approve (A) Procedures for the

Sale of Certain of the Debtors' Assets; (B) Scheduling an Auction; (C) Approving Assumption

and Assignment Procedures; (D) Approving Form of Notice; and (E) Granting Related Relief

("Bid Procedures Motion").

24.    On or about September 30, 2009, the Debtors entered into the DIP Agreement

with the Defendants, pursuant to which the Defendants provided the Debtors with DIP financing

(the "DIP Loan") on terms and conditions set forth in the DIP Agreement.   On October 2, 2009,

the Court entered a final Order approving the DIP Agreement, *inter alia*, pursuant to section 364

of the Bankruptcy Code.

25.    In relevant part, the DIP Agreement requires that the Debtors repay the DIP Loan

in full, on or before the earliest of (i) March 31, 2010; (ii) if a plan of reorganization has been

confirmed by the Bankruptcy Court, the earlier of (a) the effective date of such plan of

reorganization, or (b) the 30th day after the date of entry of the confirmation order; (iii) the

closing of a sale of substantially all of the equity or assets of the Borrower or any Guarantor; (iv)

854139_5

the date of indefeasible payment in full by Borrower of all Obligations; or (v) upon acceleration of the Loans (the "Maturity Date").

26.    The Debtors agreed to the Maturity Date provisions in reliance upon the Senior Secured Lenders' agreement in the Stipulation regarding dates for the auction and confirmation and with the understanding that any further extension of those dates would be minimal.

27.    At the time the DIP Agreement was entered into, all parties understood that the Debtors would not be in a position to repay the funds lent under the DIP Agreement without proceeds from the auction and sale. Consistently, the DIP Agreement, and the budgets provided to the Senior Secured Lenders in accordance with the DIP Agreement, provided for interest only payments with no principal amortization.

28.    Thereafter, in order to accommodate settlement discussions and facilitate an orderly auction and confirmation process, the parties to the Stipulation agreed to a minimal extension of the dates set forth in the Stipulation ("Amended Stipulation"). On October 13, 2009, the Debtors filed a Motion for an Order Pursuant To 11 U.S.C. § 1121(D) (I) Extending Debtors' Exclusive Periods Within Which to File a Chapter 11 Plan and to Solicit Acceptances Thereto and (II) Modifying the August 28, 2009 Stipulation ("Motion to Amend Stipulation").

29.    On October 15, 2009, the Court entered an Order granting the Motion to Amend Stipulation ("Amended Stipulation Order"). The Amended Stipulation Order provided for a November 18, 2009 auction date and a December 4, 2009 confirmation hearing and approval of the sale. [Docket No. 1278 at p. 3].

30.    Under the Amended Stipulation, although *exclusivity* may be extended due to force majeure, a request by the Senior Secured Lenders or a scheduling issue of the Bankruptcy Court, the parties "shall not seek a further extension" of the underlying dates themselves.

854139_5

7

31.     The full text of the relevant portion of the Stipulation, as amended by the

Amended Stipulation Order, provides:

> The Debtors' exclusive periods (the "Exclusive Periods") to file a plan of reorganization
> and to solicit acceptance of a Chapter 11 Plan is extended to, and shall irrevocably
> terminate upon, the earliest to occur of (i) December 4, 2009, (ii) failure of the Debtors to
> complete their case in support of approval of the Disclosure Statement on or before
> October 28, 2009, (iii) **failure of the Debtors to hold an auction related to the Sale
> and declare a Successful Bidder on or before November 18, 2009,** (iv) the Debtors
> withdraw or make an amendment to or seek authority to make an amendment to the
> Chapter 11 Plan . . ., and (v) the Debtors seek to extend any of the dates in (i), (ii), or (iii)
> above, without the Prepetition Agent's, Post-Petition Agent's, Requisite Lenders (as
> defined in the Loan Documents) and the Creditors' Committee's prior written consent,
> which consent may be granted or withheld in each such party's absolute discretion.
> **Neither the Debtors nor any other party-in-interest in the Bankruptcy Case shall
> seek further extension of the foregoing dates or reconsideration of such date or
> matter. Time is of the essence with regard to each date and milestone set forth in
> this paragraph and was a material inducement to the Parties entering into this
> Stipulation,** and under no circumstances shall the dates or events provided by this
> Stipulation that result in termination of exclusivity be waived or extended except as
> expressly provided by this Stipulation. Notwithstanding the foregoing, the dates set forth
> in (i), (ii), (iii) and (iv) above may be extended if the schedule is delayed due to a force
> majeure, a request by the Prepetition Agent, Steering Group, Prepetition Secured
> Lenders, or the Committee, or if the Court, *sua sponte*, changes the applicable hearing
> dates due to a change in the Court's calendar, with such extension to be no longer than
> the number of days of the delay.

[Stipulation ¶ 2, as amended by Docket No. 1278 at p. 3 (emphasis added)].

32.     The Stipulation embodied a schedule that would still permit the Debtors to

complete the confirmation process before the end of 2009 and meet their obligation to repay the

DIP Loan through the closing of a sale prior to the DIP Maturity Date.

### THE LENDERS' CREDIT BID APPEAL AND MOTION FOR STAY

33.     On October 8, 2009, this Court denied the Debtors' Bid Procedures Motion to the

extent the Bid Procedures did not permit the Senior Secured Lenders to credit bid at the auction

("credit bid issue").

854139_5

34.    On the same day that the Debtors filed the Motion to Amend Stipulation, the Debtors also filed a Notice of Appeal to the District Court seeking reversal of this Court's denial of the Debtors' Bid Procedures Motion on the credit bid issue.

35.    Cognizant of the agreed-upon schedule and the provisions of the DIP Agreement, including the Maturity Date, the Debtors did **not** seek to stay or otherwise delay the schedule to accommodate their appeal to the District Court.  Instead, the Debtors requested, and the District Court granted, an expedited appeal **in order not to delay** the sale process.

36.    On November 10, 2009, the District Court reversed this Court's decision on the credit bid issue.

37.    With the shoe now on the other foot, and in blatant contravention of the terms of the Amended Stipulation, the Senior Secured Lenders sought an immediate stay of the auction and sale pending their appeal to the United States Court of Appeals for the Third Circuit ("Credit Bid Appeal").

38.    After briefing, the District Court denied the Senior Secured Lenders' motion for a stay on the merits but nonetheless granted a seven-day stay to facilitate consideration by the Third Circuit of the issue of a stay.    In denying the stay, the District Court found that the **"other constituencies involved in the underlying bankruptcy case stand to suffer significant injury if the auction is stayed until resolution of the appeal."**  [District Ct. Order Nov. 12, 2009 at 2 (emphasis added)].    In particular, the District Court found that a stay will **"create a long period of uncertainty in the bankruptcy proceedings."**  [Id. (emphasis added)].

39.    The Senior Secured Lenders requested a stay of the auction and sale in the Third Circuit.  The Debtors opposed this stay and argued that the schedule originally agreed to by the parties should govern and that, among other things, a stay would create a significant problem in

the case because of the impending maturity of the DIP Loan. The Third Circuit nonetheless granted a stay until the scheduled argument on December 15, 2009.

40.    The entry of the stay order at the request of the Senior Secured Lenders made it impossible for a plan to be confirmed and a sale closed before the end of the year.  Accordingly, on November 17, 2009, the Debtors filed a motion advising this Court of the developments in the Credit Bid Appeal and requesting that all dates relating to the auction, the sale and confirmation (the bid deadline, the auction date, the balloting and objection deadlines and the confirmation hearing) be continued generally until after the Third Circuit decided the appeal.

41.    The Senior Secured Lenders and the Committee consented to this relief and on November 20, 2009, this Court entered an order granting the motion. Although the stay granted by the Third Circuit expired on December 15, 2009, all parties treated the auction and sale as effectively stayed pending the decision by the Third Circuit.

42.    The Debtors twice sought to schedule the auction over the objections of the Senior Secured Lenders but were unsuccessful.

43.    On March 22, 2010, the Third Circuit issued a decision on the Credit Bid Appeal, affirming the District Court's decision.   The Third Circuit held, *inter alia*:

> Because subsection (iii) of Section 1129(b)(2)(A) unambiguously permits a debtor to proceed with any plan that provides secured lenders with the "indubitable equivalent" of their secured interest in the assets and contains no statutory right to credit bidding, we will affirm the District Court's approval of the proposed bid procedures.

In re Philadelphia Newspapers, LLC, Nos. 09-4266, 4349, slip op. at 5 (3d Cir. March 22, 2010).

44.    Because of the delay in obtaining a decision from the Third Circuit (an event not within the Debtors' control) and because of the stay obtained by the Senior Secured Lenders, the Debtors have been unable to proceed with an auction, have been unable to proceed toward

confirmation of their proposed Chapter 11 plan, and have remained in bankruptcy longer than

anticipated by the parties at the time that the DIP Agreement was negotiated and executed. As a

result, Chapter 11 related expenses have been paid, depleting the Debtors' cash resources, and

the case remains stalled by the Senior Secured Lenders. Solely because of the delay in the

confirmation process caused by the Senior Secured Lenders, the Debtors will not be able to repay

the DIP Loan before the Maturity Date.

45.    At the time that the DIP Agreement was negotiated, the Debtors intended to have

emerged from bankruptcy by now, thereby permitting them sufficient time before the DIP Loan

matured within which to fully satisfy the DIP Loan.

46.    The Senior Secured Lenders' conduct in delaying the bankruptcy proceedings, in

contravention of the agreed-upon schedule, has made it impossible for the Debtors to repay the

DIP Loan by the Maturity Date (except by a replacement DIP loan from a third party on a

priming basis to which the Defendants will not agree).

47.    The parties have agreed that the auction be scheduled for April 27, 2010. The

confirmation hearing will follow a reasonable time thereafter.

## THE INVESTIGATION OF THE ILLEGAL TAPING AND RETALIATION

48.    At each turn in these cases, the Senior Secured Lenders have impeded the

Debtors' efforts to reorganize, necessitating much litigation and appeals that confirmed the

appropriateness of the Debtors' conduct.

49.    The Senior Secured Lenders' obstreperous conduct includes attempting to conceal

the facts relating to an illegal recording of a pre-petition meeting among the Debtors, the

Steering Group and Citizens at the Inquirer Building in Philadelphia on November 17, 2008 and

threats made by counsel to the Steering Group after the illegal recording was discovered.

854139_5

11

50.     The purpose of the November 17 meeting was to discuss various restructuring alternatives, including the Debtors' numerous proposals wherein investors would have invested tens of millions of dollars of much needed capital in exchange for an equity interest in the restructured enterprise.   This meeting included discussions of commercial, proprietary non-public financial information and business plans and strategies.

51.     During the meeting, the Debtors' CEO, Brian Tierney, noticed that Vincent DeVito, a representative of CIT (a member of the Steering Group) and the individual who had taken the lead in the negotiations during the meeting, was recording the meeting.   When Mr. Tierney realized what Mr. DeVito was doing, he demanded that the recorder be turned off. Counsel for Citizens concurred in Mr. Tierney's demand, correctly stating that it was illegal in Pennsylvania to record a conversation without first obtaining the consent of all of the parties.

52.     Thereafter, the Debtors requested assurance that the recording had been destroyed and that no other recording had occurred. In response, counsel for the Steering Group, Fred Hodara, Esquire, warned Debtors' counsel that "tattling" would be a mistake that would exacerbate the situation.   In-house counsel for CIT responded in writing that the recording had been erased and that no other meetings between the Debtors and the Steering Group had been recorded.[2]

53.     Following this incident, in retaliation for the Debtors' insistence upon reporting Mr. DeVito's misconduct to CIT, the relationship between the Steering Group and the Debtors deteriorated, as foreshadowed by counsel for the Steering Group's threat.   Whereas the Steering Group had previously indicated that they would present the Debtors with a proposal in early

---

[2] The letter from CIT's counsel that no other recordings had occurred was contradicted by Citizens' representative who testified that Mr. DeVito said he "usually taped" meetings.   *Shearer Dep. Tr. at 17:7* [Exhibit D-3 to the April 20, 2009 Hearing Transcript].

854139_5

January 2009 to inject new money into the business, the Debtors subsequently were informed in January 2009 that the Steering Group would not provide such funding. At that point, bankruptcy became inevitable.

54.     Concerned about the illegal recording and its effect on the Debtors' efforts to come to a consensual reorganization with the broader group of Senior Lenders, prior to filing the bankruptcy petition, the Debtors consulted the Law Firm of Elliott Greenleaf & Siedzikowski, P.C. ("Elliott Greenleaf") to provide advice to the Debtors regarding their legal options. As part of that consultation, Elliott Greenleaf compiled the relevant facts from the Debtors and conducted some preliminary research.

55.     On February 27, 2009, within days after the Debtors filed the bankruptcy petition, the Debtors filed an Application to Employ Elliott Greenleaf as Special Counsel. The Debtors sought appointment of Special Counsel to investigate and to take appropriate action in regard to the federal and state crimes that were committed against the Debtors.

56.     At the insistence of the Steering Group and as a precondition to negotiations regarding consensual DIP financing and/or a plan, on March 5, 2009, the Debtors withdrew that Motion, without prejudice.

57.     The Debtors' good faith in withdrawing the Motion accomplished nothing other than delaying the investigation, as the Senior Secured Lenders persisted in their unreasonable demand to control the reorganization process. Accordingly, the Application to retain special counsel was re-filed on April 8, 2009.

58.     On April 20, 2009, the Court denied the Debtors' application to retain Elliott Greenleaf as Special Counsel but determined that the illegal recording and subsequent threats should be investigated. Over the Debtors' objections, the Court directed counsel for the

854139_5

13

Committee to undertake the investigation of the illegal taping of meeting(s) and the aftermath of the Debtors' efforts to report that unlawful conduct.

59.     In so ruling on April 20, 2009, the Court noted its expectation that the Committee would conduct this investigation in a cooperative manner with the Debtors by, for example, conducting Rule 2004 depositions at which all parties may be present and that all parties would cooperate with discovery. The Court's ruling was without prejudice to the Debtors later re-filing their request to retain Special Counsel.

60.     Thereafter, the Debtors filed an appeal of the Court's April 20, 2009 Order denying their Application to appoint Elliott Greenleaf as Special Counsel.

61.     On June 10, 2009, the District Court reversed, in part, the Court's April 20, 2009 Order denying appointment of Special Counsel. The District Court reversed the April 20, 2009 ruling to the extent it denied appointment of Special Counsel to represent the Debtors in connection with the Committee's investigation and to provide the Debtors with legal advice on the significant events at issue.

62.     In its June 10, 2009 Memorandum Opinion, the District Court directed that the Elliott Greenleaf firm be appointed as Special Counsel to the Debtors, as it was in the "best interest" of the estate for the Debtors to immediately have legal counsel to advise them regarding the issues under investigation by the Committee.

63.     Special Counsel to the Debtors has been unable to provide adequate legal advice to the Debtors on these issues because the Committee conducted a sham investigation dictated by the Steering Group, which refused to produce relevant emails or sit for deposition.

64.     The Committee's conduct in disregarding this Court's instructions, as well as the
District Court's, confirms the merit of the Debtors' initial objection to having a third party
investigate their rights and casts serious doubt on the propriety of the investigation itself.[3]

65.     In light of the sham investigation conducted by the Committee, the Debtors filed
a Motion to Reconsider this Court's April 20, 2009 Order Denying Debtors' Request for its
Special Counsel to Conduct an Investigation ("Motion to Reconsider").  Through that Motion,
the Debtors sought to retain Elliott Greenleaf to conduct an investigation, including obtaining the
crucial emails that the Steering Group failed to produce during the Committee's "investigation"
and conducting a number of focused depositions.

66.     During argument on the Debtors' Motion to Reconsider on August 18, 2009, this
Court described the Committee investigation as a "fine mess," and stated that it was "puzzled" as
to why proper depositions were not conducted by the Committee.

67.     After the argument, the Court took the Motion to Reconsider under advisement.

68.     Thereafter, as a condition of the DIP financing, the Steering group insisted, and
the Debtors agreed, that the investigation would be "suspended until the earlier of (i) January 2,
2010 and (ii) such time as all indebtedness under the Creditors DIP is paid in full."

69.     The Debtors relied upon the Senior Secured Lenders' agreement that the
investigation would be suspended only though January 2, 2010, at the latest.

---

[3] Although this Court previously determined that the interests of the Debtors and the Committee were aligned, the
Debtors subsequently learned that the Committee has aligned itself with the Senior Secured Lenders, not the
Debtors, and that Committee's counsel suffers from fatal conflicts of interest.  For example, at the same time that
the Committee was supposed to be investigating the Senior Secured Lenders for illegal conduct, it was negotiating
its own financial deal with the very same Senior Secured Lenders.

70.    Although the Senior Secured Lenders agreed that the Debtors could pursue the investigation as of January 2, 2010, the DIP Agreement provides that the Debtors cannot use cash collateral or DIP proceeds to fund such investigation until the DIP Loan is repaid.

71.    On March 4, 2010, the Debtors sent a letter to this Court requesting that the Court promptly rule on the Motion to Reconsider since the agreement to suspend the investigation ended January 2, 2010.

72.    Consistent with their obstructionist actions with respect to the investigation, the Senior Secured Lenders not only renewed their opposition to the Motion to Reconsider but also refused to extend the Maturity Date unless the Debtors agreed that the pending Motion to Reconsider would be denied without prejudice.

73.    This is the third attempt by the Senior Secured Lenders to leverage issues relating to DIP financing in order to thwart the taping investigation. Twice before, the Debtors gave into the Senior Secured Lenders' demands. Now that the Third Circuit has ruled on the credit bid issue and the auction and confirmation hearing are no longer stalled, the Debtors cannot, consistent with their fiduciary duties, agree to further postpone the taping investigation. To further postpone the investigation would mean that it would never occur.

74.    The Bankruptcy Court has already ruled that it was in the best interests of the Debtors for an investigation to take place with depositions and all parties cooperating in producing documents. The District Court similarly rejected the Senior Secured Lenders' objection that the investigation was not in best interests of the Debtors. With these rulings, the Debtors have no choice but to now pursue the investigation despite renewed threats made by the Steering Group against the Debtors if they do so.

854139_5

16

75.     Since the Senior Secured Lenders made repayment of the DIP Loan impossible by staying the auction, the Debtors have repeatedly requested that the Defendants agree to extend the Maturity Date unconditionally. The Defendants have refused to do so and have also refused to permit a third-party bank to refinance the loan.

76.     The Defendants' refusal to extend the DIP Agreement, even though the Debtors' inability to repay the DIP Loan was caused entirely by the Senior Secured Lenders' conduct, is directly related to the Debtors' pursuit of the taping issue.

77.     The Defendants will only extend the Maturity Date if the Steering Group consents to such an extension. The Steering Group has blocked, and will continue to block, an extension of the DIP Agreement because of the Debtors' attempts to complete a real, legitimate investigation of the taping incident.   The Defendants persist in refusing to extend the DIP Agreement even though the Debtors do not propose to use cash collateral or DIP proceeds to conduct the investigation.

78.     The Debtors have a fiduciary obligation to pursue the investigation, once and for all, to determine whether the Senior Secured Lenders' extreme positions against the Debtors, including the decision not to agree to an extension of the Maturity Date, are related to the threats made by counsel for the Steering Group.

79.     The Steering Group's conduct over the last year implies that they do, indeed, having something to hide.   For example, when the Committee was charged with the investigation, the Senior Secured Lenders entered into negotiations over the treatment of the unsecured creditors' claims in the event the Senior Secured Lenders are permitted to propose a plan in these cases.  Having essentially bought off the Committee, the Steering Group then

854139_5

refused to produce any documents relating to the investigation and refused to sit for deposition, despite the prior Order of this Court.

80.    Then, the Steering Group demanded that the Debtors suspend the investigation until January 2, 2010.  Now that over two months have passed since January 2, 2010, the Steering Group is once again trying to prevent the investigation.

81.    The Debtors do not propose to use cash collateral or DIP proceeds for the investigation, so there is no immediate cost to the estate.  Instead, after the investigation and these cases are over, the Court will determine whether the investigation benefited the Debtors' estate.  Thus, there is no legitimate reason for the Senior Secured Lenders to condition the extension of the Maturity Date on perpetual postponement of the investigation.  Rather, it is merely one more attempt to avoid transparency and full disclosure.

82.    The continued delay of the investigation, until it becomes irrelevant to the reorganization process, is not consistent with the Debtors' fiduciary duties.

## THE MATURITY DATE AND REMEDIES

83.    The DIP Agreement provides that, if the DIP Loan is not repaid by March 31, 2010, an "Event of Default" will occur.  The DIP Agreement further provides that, upon an Event of Default, the "Administrative Agent may, and at the request of the Requisite Lenders, shall cause the Collateral Agent to enforce any and all Liens and securities interests created pursuant to the Collateral Documents and, upon five Business Day's notice to the Borrower and the Committee, realize on any or all Collateral without the necessity of obtaining further relief or order from the Bankruptcy Court."

84.    Given the Defendants' refusal to extend the Maturity Date without additional and unacceptable conditions, the Defendants could exercise the above remedies if the DIP Loan is

854139_5

not repaid by March 31, 2010.   The Debtors have worked strenuously over the past few months to achieve a fair and competitive auction that will maximize value for all constituencies. Execution on the Debtors' collateral by the Defendants will derail the Debtors' reorganization and, as predicted by the Debtors in their opposition to the Senior Secured Lenders' stay motion in the Third Circuit, result in a catastrophe for the creditors, employees and the community as a whole.

**COUNT I**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**

85.   The Debtors incorporate herein by reference the allegations contained in paragraphs 1 through 84 above as if fully set forth herein.

86.   The Debtors bring this Count pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, which provides in relevant part: "In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

87.   The Debtors and Defendants are parties to the DIP Agreement and the Debtors seek a declaration of their rights and obligations under that Agreement.

88.   Specifically, the Debtors seek a declaration that the Defendants are equitably estopped from declaring an Event of Default and that the Debtors' obligation to repay the DIP Loan on or before March 31, 2010 is excused by Defendants' breach of the agreed upon schedule by obtaining a stay of the auction process and/or by the doctrines of impracticality, impossibility, prevention and/or frustration of performance.

89.   The Debtors further seek a declaration that the Senior Secured Lenders breached the Amended Stipulation by seeking a stay of the dates set forth therein.

854139_5

90.    Although the Debtors have attempted to seek a consensual extension of the DIP Maturity Date, such efforts have been unsuccessful.

91.    An actual, substantial and immediate controversy exists between the parties concerning the obligations under the DIP Agreement.

92.    The instant controversy is adequately developed for judicial review and is not speculative or remote.

93.    This Court's intervention in addressing this controversy will aide in the determination of a genuine, justifiable controversy.

94.    All parties understood at the time of the DIP Agreement that final repayment of the DIP Loan was dependent upon the Debtors' successful reorganization through an auction and sale of assets.  Consistently, all parties agreed to a schedule whereby the Debtors would be able to complete the auction and sale and pursue confirmation, including a reasonable time for a confirmation order to issue, well before the Maturity Date.

95.    Because of the conduct of the Senior Secured Lenders and through no fault of the Debtors, the Debtors will not be able to complete the confirmation process by March 31, 2010 and, consequently, will not be able to repay the DIP Loan by that date.

96.    If this Court does not issue a declaratory judgment temporarily excusing the Debtors' March 31, 2010 repayment of the DIP Loan, the Debtors and their constituencies will suffer avoidable damages and irreparable harm.

**WHEREFORE**, the Debtors respectfully request that this Court issue a judgment declaring that the Debtors are excused from repayment of the DIP Loan until the effective date of a plan and sale of the Debtors' assets, as originally contemplated by the Stipulation, and granting such other relief as may be just and proper.

854139_5

## COUNT II
## INJUNCTIVE RELIEF UNDER SECTION 105(a) and RULE 7065

97.    The Debtors incorporate herein by reference the allegations contained in paragraphs 1 through 96 above as if fully set forth herein.

98.    Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Relief under section 105 of the Bankruptcy Code is particularly appropriate in a chapter 11 case when necessary to protect a debtor's ability to effectively confirm a plan and to preserve the property of a debtor's estate.

99.    The Debtors are entitled to a preliminary injunction under section 105(a) of the Bankruptcy Code, enjoining the Defendants from declaring an Event of Default under the DIP Agreement, and exercising remedies arising from such Event of Default, as a result of the Debtors' failure to repay the DIP Loan by March 31, 2010 or any other default that arises because of the passage of time.

100.    Unusual circumstances exist that demonstrate that the Debtors are entitled to an injunction.

101.    All parties understood at the time of the DIP Agreement that final repayment of the DIP Loan was dependent upon the Debtors' successful reorganization through an auction and sale of assets. Consistently, all parties agreed to a schedule whereby the Debtors would be able to complete the auction and sale and pursue confirmation, including a reasonable time for a confirmation order to issue, well before the Maturity Date.

102.    Because of the conduct of the Senior Secured Lenders and through no fault of the Debtors, the Debtors will not be able to complete the confirmation process by March 31, 2010 and, consequently, will not be able to repay the DIP Loan by that date.

103. The Defendants will suffer no irreparable harm by being temporarily enjoined from declaring an Event of Default against the Debtors.

104. The Defendants will suffer no monetary harm as a result of the delay in repayment of the DIP Loan (which the Senior Secured Lenders caused) because the Debtors will continue to pay interest at the agreed upon (non-default) interest rate in the DIP Agreement.

105. In any event, any conceivable harm suffered by the Defendants is vastly outweighed by the harm that would be suffered by the Debtors and other creditors in the absence of an injunction.

106. The Debtors are also entitled to a preliminary injunction pursuant to Rule 7065 as: (a) the Debtors have a substantial likelihood of success on the merits, (b) there is a substantial risk of irreparable harm to the Debtors if the injunction is not issued, (c) the harm to the Debtors outweighs the potential harm to the Defendants presented, and (d) injunctive relief would not violate the public interest but would, instead, promote the likelihood that the Debtors can successfully reorganize.

854139_5

22

**WHEREFORE**, for all the foregoing reasons, the Debtors respectfully request entry of

an Order granting a preliminary injunction enjoining Defendants from declaring an Event of

Default and granting such other relief as this Court deems just.

Dated: March 23, 2010
Philadelphia, Pennsylvania

/s/ Lawrence G. McMichael
**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Christie Callahan Comerford
Anne M. Aaronson
Catherine G. Pappas
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Facsimile: (215) 575-7200

-and-

**PROSKAUER ROSE LLP**
Mark K. Thomas
Paul V. Possinger
Peter J. Young
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

*Co-counsel for the Debtors*

854139_5