# EXHIBIT C

[Thayer Declaration]

| | |
|---|---|
| In re: | Chapter 11 |
| Philadelphia Newspapers, LLC, *et al.*, | Case No. 09-11204(SR) |
| Debtors. | Jointly Administered |
| Philadelphia Newspapers, LLC, *et al.*<br>400 North Broad Street<br>Philadelphia, PA 19103, | Adversary No. 10-00110(SR) |
| Plaintiffs, | |
| v. | |
| Citizens Bank of Pennsylvania<br>1701 John F. Kennedy Boulevard<br>22nd Floor<br>Philadelphia, PA 19103,<br><br>Wells Fargo Foothill, Inc.<br>2450 Colorado Avenue, Suite 3000W<br>Santa Monica, CA 90404,<br><br>Credit Suisse Loan Funding LLC<br>11 Madison Avenue<br>New York, NY 10010, | |
| Defendants. | |

## DECLARATION OF RICHARD R. THAYER IN SUPPORT OF DEBTORS' MOTION FOR INJUNCTIVE RELIEF

I, Richard R. Thayer, hereby declare under penalty of perjury:

1. I am the Executive Vice President, Finance, of Debtors PMH Acquisition, LLC, a Delaware Limited Liability Company, Broad Street Video, LLC, a Delaware Limited Liability Company, Philadelphia Newspapers, LLC, a Pennsylvania Limited Liability Company, Philadelphia Direct, LLC, a Pennsylvania Limited Liability Company, Philly Online, LLC, a Pennsylvania Limited Liability Company, PMH Holdings, LLC, a Delaware Limited Liability

854554_1

Company, Broad Street Publishing, LLC, a Delaware Limited Liability Company, Philadelphia Media, LLC, a Delaware Limited Liability Company, and Philadelphia Media Holdings, LLC, a Delaware Limited Liability Company, each a debtor and debtor-in-possession in the chapter 11 cases underlying this appeal (collectively, the "Debtors").

2. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein. Unless otherwise indicated, all facts set forth herein are based upon my personal knowledge.

3. On August 28, 2009, the Debtors entered into a Stipulation and Order ("the Stipulation") resolving various issues in the underlying bankruptcy cases, including debtor-in-possession financing. The Stipulation provided that Citizens Bank, as Agent for the prepetition Senior Secured Lenders (the "Agent") and certain others of the prepetition Senior Secured Lenders would provide postpetition financing to the Debtors, and that the Debtors would sell substantially all of their assets pursuant to a firm schedule set forth in the Stipulation.

4. Subsequently, the Debtors entered into a Debtor-in-Possession Credit and Guaranty Agreement (the "DIP Agreement") with the Defendants in this adversary action, including the Agent, pursuant to which those parties (the "DIP Lenders") provided the Debtors with DIP financing (the "DIP Loan") on terms and conditions set forth in the DIP Agreement. [DIP Agreement excerpts, Ex. 1 hereto]

5. When the DIP Agreement was entered into, all parties understood that the Debtors would not be in a position to repay the funds lent under the DIP Agreement without proceeds from the sale of substantially all the Debtors' assets, which the parties agreed would occur by year-end 2009.

6. Consistently, the DIP Agreement, and the budgets provided to the Senior Secured Lenders in accordance with the DIP Agreement, provided for interest only payments with no principal amortization.

7. On November 17, 2009, the Third Circuit Court of Appeals granted a limited stay through December 15, 2009, at which point it became apparent that that the Debtors would be unable to emerge from bankruptcy by December 31, 2009, as originally anticipated.

8. Rather than litigate the issue of a further stay and in order to provide the Third Circuit with an opportunity to determine the credit bid issue, the Debtors requested that this Court continue generally all dates relating to the auction, the sale and confirmation (the bid deadline, the auction date, the balloting and objection deadlines and the confirmation hearing).

9. Despite the Debtors' best efforts to manage cash so as to avoid curtailing operations of the newspapers during the almost four month delay, the Debtors will not be able to repay the DIP Loan before the Maturity Date.

10. Because of the delay in obtaining a decision from the Third Circuit (an event not within the Debtors' control) and because of the stay obtained by the Senior Secured Lenders, the Debtors have to date been unable to proceed with an auction, have been unable to proceed toward confirmation of their proposed Chapter 11 plan, and have remained in bankruptcy longer than anticipated by the parties at the time that the DIP Agreement was negotiated and executed. As a result, Chapter 11 related expenses have been paid, depleting the Debtors' cash resources. Solely because of the delay in the confirmation process caused by the Senior Secured Lenders, the Debtors will not be able to repay the DIP Loan before the Maturity Date.

11. The DIP Agreement provides that if the DIP Loan is not repaid by March 31, 2010, an Event of Default will occur. [DIP Agreement (Ex. 1) at §1.1 p. 16, §2.11 p. 34]. The

DIP Agreement further provides that, upon an Event of Default, the "Administrative Agent may, and at the request of the Requisite Lenders, shall cause the Collateral Agent to enforce any and all Liens and securities interests created pursuant to the Collateral Documents and, upon five Business Day's notice to the Borrower and the Committee, realize on any or all Collateral without the necessity of obtaining further relief or order from the Bankruptcy Court." [DIP Agreement (Ex. 1) at §8.1 p. 85].

12. The Debtors agreed to the Maturity Date provisions in reliance upon the Senior Secured Lenders' agreement in the Stipulation regarding dates for an auction and confirmation.

13. The DIP Lenders have not agreed to extend the Maturity Date of the DIP Loan and have not agreed to permit the Debtors to pay off the DIP Loan with another loan from a third-party bank.

14. Given the DIP Lenders' refusal to extend the Maturity Date, the DIP Lenders could exercise the above remedies if the DIP Loan is not repaid by March 31, 2010.

15. Execution on the Debtors' collateral by the DIP Lenders will derail the Debtors' reorganization and result in a catastrophe for the Debtors' creditors, employees, and the community as a whole.

16. The Debtors have worked strenuously over the past few months to achieve a fair and competitive auction that will maximize value for all constituencies. Such efforts will be fruitless if the DIP Lenders are permitted to exercise remedies.

By: _____
Richard R. Thayer
Executive Vice President,
Finance

4

854554_1

# EXHIBIT 1

[DIP Agreement Excerpts]

# DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

dated as of September 30, 2009

among

**PHILADELPHIA NEWSPAPERS, LLC,**
as a Debtor and Debtor-in-Possession,

as Borrower

and

**PHILADELPHIA MEDIA HOLDINGS, LLC,**
as a Debtor and Debtor-in-Possession,

**PMH ACQUISITION, LLC,**
as a Debtor and Debtor-in-Possession,

**PMH HOLDINGS, LLC,**
as a Debtor and Debtor-in-Possession,

**PHILADELPHIA DIRECT, LLC,**
as a Debtor and Debtor-in-Possession,

**PHILLY ONLINE, LLC,**
as a Debtor and Debtor-in-Possession,

**BROAD STREET VIDEO, LLC,**
as a Debtor and Debtor-in-Possession,

**PHILADELPHIA MEDIA, LLC,**
as a Debtor and Debtor-in-Possession,

**BROAD STREET PUBLISHING, LLC,**
as a Debtor and Debtor-in-Possession,

as Guarantors,

**VARIOUS LENDERS,**

and

**CITIZENS BANK OF PENNSYLVANIA,**
as Administrative Agent and Collateral Agent and Co-Syndication Agent
and Lead Arranger

and

**WELLS FARGO FOOTHILL, INC.**
as Co-Syndication Agent

---

Senior Secured, Super-Priority Debtor-in-Possession Credit Facility

---

PHTRANS/ 741436.38

## DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of September 30, 2009 is entered into by and among, **PHILADELPHIA NEWSPAPERS, LLC**, a Pennsylvania limited liability company, as a debtor and debtor-in-possession ("**Company**" and the "**Borrower**"), **PMH ACQUISITION, LLC**, a Delaware limited liability company ("**Holdings**"), **CERTAIN SUBSIDIARIES OF HOLDINGS** and **PHILADELPHIA MEDIA HOLDINGS, LLC** ("**Parent**") each as a debtor and debtor-in-possession, as Guarantors (the Company, Holdings, Parent, and the certain Subsidiaries of Holdings a party hereto, are referred to collectively as the "**Debtors**"), the Lenders party hereto from time to time, **CITIZENS BANK OF PENNSYLVANIA** ("**Citizens**"), as Administrative Agent (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**") and as Collateral Agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") and as Co-Syndication Agent (in such capacity, together with its successors and assigns in such capacity, the "**Citizens Syndication Agent**") and as Lead Arranger, and **WELLS FARGO FOOTHILL, INC.**, as Co-Syndication Agent (in such capacity, together with its successors and assigns in such capacity, the "**Wells Syndication Agent**" and together with the Citizens Syndication Agent, the "**Syndication Agents**").

### RECITALS:

WHEREAS, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, the Borrower and the Guarantors have commenced voluntary cases (the "**Chapter 11 Cases**") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**"), and the Borrower continues to operate its businesses and manage its properties as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has asked the Lenders to provide a credit facility (the "**Post-Petition Facility**") in an aggregate principal amount not to exceed $15,000,000 at any time outstanding, consisting of a revolving credit facility in an aggregate principal amount not to exceed $9,750,000 at any time, and a term loan in an aggregate principal amount not to exceed $5,250,000 at any time. The Lenders have severally, and not jointly, agreed to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**SECTION 1.   DEFINITIONS AND INTERPRETATION**

**1.1   Definitions.** The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Account(s)**" means any account or Account as defined under the UCC.

"**Account Debtor**" means any account debtor as defined under the UCC.

PHTRANS/ 741436.38

that the Final Bankruptcy Court Order contains findings of fact and conclusions of law that all advances and grant of Liens under this Agreement are extended and granted in good faith and receive the protections afforded by section 364(e) of the Bankruptcy Code.

"**Final Bankruptcy Court Order Entry Date**" means the date on which the Final Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court.

"**Final Maturity Date**" means the date which is the earliest of (i) six months from the date hereof; (ii) the earlier of (a) the date upon which the Interim Bankruptcy Court Order expires, or (b) 30 days after the entry of the Interim Bankruptcy Court Order, in either case, if the Final Bankruptcy Court Order has not been entered prior to the expiration of such period; (iii) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (a) the effective date of such plan of reorganization, or (b) the 30th day after the date of entry of the confirmation order; (iv) the closing of a sale of substantially all of the equity or assets of the Borrower or any Guarantor; (v) the date of indefeasible payment in full by Borrower of all Obligations; or (vi) upon acceleration of the Loans.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Company or Holdings that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and, the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document or any Bankruptcy Court Order, that such Lien is a valid, legal and enforceable Lien having priority over all other Liens to which such Collateral is subject, other than Permitted Priority Liens.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year (it being acknowledged that the Parent and its Subsidiaries use a "5-4-4" fiscal quarter structure).

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending during the last week of each calendar year (it being acknowledged that the Parent and its Subsidiaries use a "5-4-4" fiscal year structure).

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Funding Guarantor**" as defined in Section 7.2 (Contribution by Guarantors).

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

PHTRANS/ 741436.38                              - 16 -

(a) Subject to Section 2.17 and so long as no Default or Event of Default shall have occurred and then be continuing, Borrower shall have the option:

(i) to convert at any time all or any part of a Base Rate Loan into an Adjusted LIBOR Rate Loan, and vice versa; provided an Adjusted LIBOR Rate Loan may only be converted on the expiration of the Interest Period applicable to such Adjusted LIBOR Rate Loan; or

(ii) upon the expiration of any Interest Period applicable to any Adjusted LIBOR Rate Loan, to continue all or any portion of such Loan equal to $100,000 and integral multiples of $100,000 in excess of that amount as an Adjusted LIBOR Rate Loan.

(b) Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 11:00 a.m. (Eastern time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, an Adjusted LIBOR Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Adjusted LIBOR Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to effect a conversion or continuation in accordance therewith.

2.9 **Default Interest.** Upon the occurrence and during the continuance of any Event of Default, the principal amount of the Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed or from time to time becoming due hereunder, shall thereafter bear interest (including post petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.9 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of any Agent or any Lender. For the sake of clarity, the default rate is applicable from the date that an Event of Default commences, which, in the case of an Event of Default arising out of Section 6.20 (Financial Covenants) shall be deemed to occur on the last day of the applicable fiscal quarter and may be applied retroactively by the Administrative Agent.

2.10 **Fees.** The Borrower shall pay to the Administrative Agent (a) on the Facility Effective Date, for the account of each Lender a fee equal to 3.50% of such Lender's Commitment, (b) for the account of each Lender a fee equal to 4.50% per annum of the daily average undrawn amount of such Lender's Commitment, payable monthly in arrears on the first Business Day of the month, and (c) such other fees as are required pursuant to the Fee Letter.

2.11 **Repayment of Loans.** All outstanding amounts due under the Loans and hereunder, including any accrued and unpaid interest (including any default interest due pursuant to Section 2.9), fees and other charges arising hereunder, must be paid in full, if not payable prior to such date, on the Final Maturity Date.

PHTRANS/ 741436.38                                    - 34 -

to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8    Continuing Guaranty.** This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full and the Commitments shall have terminated. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9    Authority of Guarantors or Borrower.** It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10    Financial Condition of Borrower.** Any Credit Extension may be made to Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower. Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by any Beneficiary.

**7.11    Discharge of Guaranty Upon Sale of Guarantor.** If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) to a Person that is not a Credit Party or Affiliate of a Credit Party in accordance with the terms and conditions hereof including any requirements respecting application of the proceeds of such sale, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**SECTION 8.    EVENTS OF DEFAULT**

**8.1    Events of Default.** If any one or more of the following conditions or events shall occur:

(a)    <u>Failure to Make Payments When Due</u>. Failure by Borrower or any other Credit Party to pay (i) when due the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (iii) when due any interest on any Loan or any fee or any other amount due hereunder.

(b)    <u>Default in Other Agreements</u>. (i) Failure of any Credit Party to pay when due any principal of or interest on or any other amount payable in respect of one or

PHTRANS/ 741436.38                    - 81 -

more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)), the principal amount of which is $250,000 or more (individually or in the aggregate) other than amounts under the Pre-Petition Credit Agreement and the Senior Subordinated Notes, or (ii) breach or default by a Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above, or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) or to require the prepayment, redemption, repurchase or defeasance of, or to cause a Credit Party to make any offer to prepay, redeem, repurchase or defease such Indebtedness, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c) <u>Breach of Certain Covenants</u>. Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.5, Sections 5.1, 5.2, 5.5, 5.6, 5.10(a), 5.11, 5.14, or 5.15, or Section 6 or any provision of any Bankruptcy Court Order; or

(d) <u>Breach of Representations, etc.</u> Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect (to the extent not otherwise qualified as to materiality) as of the date made or deemed made; or

(e) <u>Other Defaults Under Credit Documents</u>. Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other section of this Section 8.1, and such default, if capable of being remedied, shall remained unremedied for a period of 15 days; or

(f) <u>Appointment of a Receiver</u>. Appointment of a receiver, or other officer with similar powers, with respect to any Credit Party.

(g) <u>Judgments and Attachments</u>. One or more money judgments, writs or warrants of attachment or similar processes involving an amount, individually or in the aggregate in excess of $250,000 at any time, (to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company has acknowledged coverage), shall be entered or filed against any Credit Party or any of their respective assets and either (i) enforcement proceedings are commenced in connection therewith; or (ii) such money judgment, write or warrant of attachment and shall remain undischarged, unvacated, unbonded or unstayed for a period of 10 consecutive Business Days; or

(h) <u>Dissolution</u>. Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party; or

(i) <u>Employee Benefit Plans</u>. (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result

PHTRANS/ 741436.38               - 82 -

in liability of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $250,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 401(a)(29) or 412(n) of the Internal Revenue Code or under ERISA or the non-U.S. equivalent thereof; or

(j) <u>Change of Control</u>. A Change of Control shall occur; or

(k) <u>Guaranties, Collateral Documents and other Documents</u>. At any time after the execution and delivery thereof, (i) the Guaranty, for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor, as applicable, shall repudiate its obligations thereunder; (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document or created by the Bankruptcy Court Orders, in each case for any reason; or (iii) any Credit Party or any Subsidiary of any Credit Party shall (x) contest the validity or enforceability of any Credit Document or any of the Obligations or deny that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party, (y) attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent and/or the Lenders, claims or rights against such Person or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, or (z) commence any action which contests the validity, perfection or enforceability of any of the Liens and security interests of any Agent and/or the Lenders created by any of the Bankruptcy Court Orders, this Agreement, and any Pledge and Security Agreement or any other security agreement; or

(l) <u>Environmental Liabilities</u>. Any Credit Party or any of its Subsidiaries shall be liable for any environmental liabilities or related costs the payment of which could reasonably be expected to have a Material Adverse Effect; or

(m) <u>Proceedings</u>. The indictment of any Credit Party or any of its managers, officers or directors under any criminal statute, or commencement of criminal or civil proceedings against any such Person or any of its Subsidiaries pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person; or

(n) <u>Cessation of Business</u>. (i) Any Credit Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business; (ii) any other cessation of a substantial part of the business of Holdings or any of its Subsidiaries for a period which materially and adversely affects Holdings or any of its Subsidiaries; or (iii) any material damage to, or loss, theft or destruction of, any Collateral whether or not insured or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes the cessation or substantial curtailment of revenue producing activities at a Facility; or

PHTRANS/ 741436.38

- 83 -

(o)   Material Adverse Effect. The occurrence of a Material Adverse Effect; or

(p)   Appointment of Trustee or Examiner. Unless otherwise agreed to by the Administrative Agent and the Requisite Lenders, an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Credit Party or any Subsidiary of a Credit Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under section 1104 of the Bankruptcy Code; or (ii) a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code; or

(q)   Conversion to Chapter 7. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case; or

(r)   Dismissal of Chapter 11. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the total Commitment, and payment in full in cash of all Obligations of the Borrower hereunder and under the other Credit Documents upon entry thereof; or

(s)   Order with respect to Chapter 11. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Agents and the Requisite Lenders, (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except for Agreed Administrative Expense Priorities, or (iii) to grant or permit the grant of a Lien on the Collateral (other than Permitted Liens), without the express prior written consent of the Agents and the Requisite Lenders; or

(t)   Application for Order. An application for any of the orders described in clauses 8.1(p) through 8.1(s) above shall be made by a Person and such application is not contested by such Credit Party in good faith or the relief requested is not withdrawn, dismissed or denied within 10 days after filing or any Person obtains a final order under section 506(c) of the Bankruptcy Code against the Agents or the Lenders or obtains a final order adverse to the Agents or the Lenders or any of their respective rights and remedies under the Credit Documents or in the Collateral; or

(u)   Relief from Automatic Stay. An order shall be entered by the Bankruptcy Court that is not stayed granting relief from the automatic stay to one or more creditors of the Borrower; or

(v)   Liquidation. The determination of a Credit Party, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or

other application in the Chapter 11 Cases, seeking authority to do any of the foregoing, in each case, without the prior consent of the Administrative Agent and the Lenders; or

(w)    Pre-Petition Payments. Except as set forth herein or as otherwise agreed in writing by the Administrative Agent and the Requisite Lenders, any Credit Party shall make any Pre-Petition Payment (including without limitation, any payment in connection with the settlement of any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened, or pursuant to any judgment); or

(x)    Committees. Unless none of the Credit Parties have prior notice of such appointment, the failure of the Credit Parties to oppose the appointment of any official committee other than an official unsecured creditors' committee in the Chapter 11 Cases; provided that if none of the Credit Parties have prior notice of such appointment, it shall be an Event of Default if the Credit Parties do not promptly file and diligently pursue an objection to such appointment or motion for disbandment of such committee, in either case in form and substance satisfactory to the Administrative Agent; or

(y)    Cash Collateral. (i) The use of Cash Collateral without either (x) the consent of the Administrative Agent and the Requisite Lenders, or (y) pursuant to a Bankruptcy Court Order, or (ii) a default under any order of the Bankruptcy Court authorizing the use of Cash Collateral; or

(z)    Obligations. Any Credit Party shall seek to reduce, setoff, or subordinate the Obligations.

THEN, upon the occurrence of any such event (an "**Event of Default**") (A) upon notice to the Borrower by Administrative Agent (which notice the Administrative Agent shall give if requested by the Requisite Lenders), each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans, and (II) all other Obligations; and (B) Administrative Agent may, and at the request of the Requisite Lenders, shall, cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents and, upon five Business Days' written notice to the Borrower and the Committee, realize on any or all Collateral without the necessity of obtaining further relief or order from the Bankruptcy Court.

The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Credit Documents, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order and with respect to the Collateral. The only issue as to which the Debtors may seek Bankruptcy Court intervention at any hearing seeking to delay or prevent the Administrative Agent and Lenders from exercising remedies shall be whether an Event of Default has, in fact, occurred and is continuing.

### SECTION 9.    AGENTS

**9.1    Appointment of Agents.** Citizens is hereby appointed Administrative Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Citizens, in such capacity, to act as its agent in accordance with the terms hereof and the other

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWER:**

**PHILADELPHIA NEWSPAPERS, LLC**

By: _____
Name: Brian Tierney
Title:  Manager

**GUARANTORS:**

**PMH ACQUISITION, LLC**
**PMH HOLDINGS, LLC**
**PHILADELPHIA DIRECT, LLC**
**PHILLY ONLINE, LLC**
**BROAD STREET VIDEO, LLC**
**PHILADELPHIA MEDIA, LLC**
**BROAD STREET PUBLISHING, LLC**
**PHILADELPHIA MEDIA HOLDINGS LLC**

By: _____
Name: Brian Tierney
Title:  Manager
**on behalf of each of the above Persons**

*[signature page to Debtor-In-Possession Credit and Guaranty Agreement]*

PHTRANS/ 741436

**CITIZENS BANK OF PENNSYLVANIA,**
as Administrative Agent, Collateral Agent, Co-Syndication Agent and a Lender

By: _____
Name: Karen Budniak
Title: Vice President

*[signature page to Debtor-In-Possession Credit and Guaranty Agreement]*

PHTRANS/ 741436

**WELLS FARGO FOOTHILL, INC.**
as Co-Syndication Agent and a Lender

By: _____
Name: KEVIN P SMITH
Title: VICE PRESIDENT

*[signature page to Debtor-In-Possession Credit and Guaranty Agreement]*

CREDIT SUISSE LOAN FUNDING LLC *MH*
as a Lender

By: _____

Ian Landow                    Ronald Gotz
Authorized Signatory          Authorized Signatory

Name:
Title:

*[signature page to Debtor-In-Possession Credit and Guaranty Agreement]*

PHTRANS/ 741436